1

2

3  STEVEN E. SCHWARZ
   REENA LEVIN
   2461 W. FOSTER AVE., #1W
4  CHICAGO, IL 60625
   (773) 837-6134
5  **PLAINTIFFS** *IN PRO SE*

6

7

8                  **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11 STEVEN E. SCHWARZ and REENA LEVIN, )
   joint tenants,                     )
12                                    )
              Plaintiffs,             )   Case No.  C-11-04783 (DMR)
13                                    )
          v.                          )
14                                    )
   SELLERS MARKETS, INC., JAMES       )
15 SELLERS, in his individual capacity and in )   **JURY DEMANDED**
   his professional capacity, DEBORAH )
16 SELLERS, in her individual capacity and in )
   her professional capacity, TENNYSON WEST )
17 LLC, BANCROFT PARTNERS LLC,        )
   MICHAEL SCHMITZ, DAVID SLOAN,      )
18 AQUILLIAN INVESTMENTS LLC, and     )
   RESTAURANT SOLUTIONS, INC.         )
19                                    )
              Defendants.             )
20                                    )
                                      )
21 _____ )

22                         **COMPLAINT**

23        NOW COME STEVEN SCHWARZ ("Schwarz") and REENA LEVIN ("Levin"),

24 husband and wife (hereafter, "Plaintiffs"), suing as joint tenants and represented by Schwarz, an

25 attorney, and who complain of SELLERS MARKETS, INC. (hereafter, "SMI"), JAMES

26 SELLERS (hereafter, "JS"), and DEBORAH SELLERS, (hereafter, "DS"), TENNYSON WEST

27 LLC (hereafter, "Tennyson"), BANCROFT PARTNERS LLC (hereafter, "Bancroft"),

28

MICHAEL SCHMITZ (hereafter, "Schmitz"), DAVID SLOAN, (hereafter, "Sloan"), AQUILLIAN INVESTMENTS, INC., (hereafter, "Aquillian"), and RESTAURANT SOLUTIONS, INC., (hereafter, "RSI") as follows:

## SUMMARY

1.       This is a securities fraud case concerning misrepresentations made by sellers of Series B Preferred stock shares in a restaurant business.  As detailed below, JS and DS misrepresented key facts to the Plaintiffs when they were deciding whether or not to invest in SMI.  This was done as a ploy to induce Plaintiffs to invest.

2.       When Plaintiffs were still deciding whether or not to invest, JS, SMI's President and CEO, told Schwarz that he would be able to redeem his shares on the three year anniversary of their closing date for their purchase price $40,000 plus 5% interest per annum.  JS never told Schwarz that SMI would only make payment if it earned a certain amount of income or generated a certain amount of profit.  Had JS told Schwarz that, Plaintiffs would not have invested.

3.       When Plaintiffs were still deciding whether or not to invest, JS told Schwarz that he could expect to see a 30% return on his investment.  Had JS not told Schwarz that, Plaintiffs would not have invested.

4.       Now, with SMI on the verge of insolvency, SMI, JS, and DS attempt to renege on their contractual promise to redeem Plaintiffs' shares by i) telling Plaintiffs, for the first time, that their redemption rights were contingent on SMI's performance; and ii) revealing to Plaintiffs, for the first time, that SMI had been overstating the value of its assets and that its financial statements were not prepared according to Generally Accepted Accounting Principles (GAAP) as part of a scheme to evade honoring Plaintiffs' redemption demand.

## **PARTIES**

5.     Plaintiffs STEVEN SCHWARZ and REENA LEVIN, joint tenants, are, and at all times relevant to this action were, a married couple residing in the County of Cook, State of Illinois.

6.     Defendant SELLERS MARKETS, INC. ("SMI") is, and at all times relevant to this action, was a corporation doing business in the State of California.

7.     Defendant JAMES SELERS ("JS") is, and at all times relevant to this action was, a former Illinois resident currently residing in the State of California.

8.     Defendant DEBORAH SELLERS ("DS") is, and at all times relevant to this action was, a former Illinois resident currently residing in the State of California.

9.     Defendant MICHAEL SCHMITZ  ("Schmitz") is, and at all times relevant to this action was, a resident of California and an employee, first, of Tennyson, and then, of Bancroft.  He acted as financial advisor to SMI when Plaintiffs invested in SMI and, upon information and belief, continues to act as financial advisor to SMI.

10.     Defendant DAVID SLOAN ("Sloan")  is, and at all times relevant to this action was, a resident of California and, first, a Partner for Tennyson, and then the Managing Partner for Bancroft.  He acted as financial advisor to SMI when Plaintiffs invested in SMI and, upon information and belief, continues to act as financial advisor to SMI.

11.     Defendant TENNYSON WEST LLC ("Tennyson") is, and at all times relevant to this action was, a California company describing itself as a "boutique investment banking firm that provides financial advisory services to real estate, financial services, energy, and retail industries."  It acted as financial advisor to SMI when Plaintiffs invested in SMI and, upon information and belief, continues to act as financial advisor to SMI.

12.     Defendant BANCROFT PARTNERS ("Bancroft") is, and at all times relevant to this action was, a Delaware company with an office in California describing itself as a "financial

advisory firm, serving companies, entrepreneurs and investors."  It succeeded Tennyson as financial advisor to SMI and, upon information and belief, continues to act as financial advisor to SMI.

13.     Defendant AQUILLIAN INVESTMENTS, INC.,("Aquillian") is, and at all times relevant to this action was, a Delaware company with an office in California describing itself as a "boutique investment firm".  It acted as broker-dealer to SMI when Plaintiffs invested in SMI and, upon information and belief, continues to act as broker-dealer to SMI.

14.     Defendant RESTAURANT SOLUTIONS, INC., ("RSI") is, and at all times relevant to this action was, a Colorado company doing business nationwide.  It acted as accountant to SMI when Plaintiffs invested in SMI and, upon information and belief, continues to act as accountant to SMI.

## **VENUE AND JURISDICTION**

15.     This court has jurisdiction of this case pursuant to 15 U.S.C.A. § 10b, § 27 of the 1934 Act, and pursuant to 28 U.S.C. § 1331 and 1332.  This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and § 27 of the 1934 Act because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and a substantial part of the property that is the subject of this action is situated in this district.

17.     Venue is also proper in this District because, on or about July 11, 2006, SMI purposefully availed itself of the laws of the State of Illinois by filing with the Illinois Securities Department a document titled, "Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or Uniform Limited Offering Exemption" covering the issuance of its Series B preferred stock on June 27, 2006 and September 18, 2006.

18.     Venue is also proper in this District because SMI, JS, DS, Schmitz, Sloan, Tennyson, and Bancroft each solicited Plaintiffs for additional money while Plaintiffs were located in this District.

## FACTS COMMON TO ALL COUNTS

19.     Unless otherwise noted, Plaintiffs and their corporate counsel were in Chicago, Illinois and Defendants and their counsel were, upon information and belief, in San Francisco, California when the events alleged occurred.

## INTRODUCTION AND FACTUAL BACKGROUND

20.     In June of 2006, "Sellers Markets" was a restaurant in San Francisco, California.  The restaurant opened for business in April of 2005.  The restaurant was owned by Sellers Markets, Inc., ("SMI") a corporation.  The principals of the corporation were James Sellers ("JS"), the corporation's President and Chief Executive Officer, and his wife, Deborah Sellers ("DS"), the corporation's Corporate Secretary.  Both JS and DS were, and still are, also members of the Board of Directors of Sellers Markets, Inc.

21.     In June of 2006, Defendants were soliciting investors for the Company's Series B Preferred Stock.

22.     In June of 2006, SMI, JS, and DS were planning on opening a second store in San Francisco, California.

23.     In June of 2006, Schwarz spoke on the telephone with JS about investing in SMI.

24.     During the June, 2006 telephone conversation, Schwarz asked JS what the SMI's exit strategy was.  JS told Schwarz that he had plans to either take the SMI public in an IPO, sell it to a large restaurant chain like McDonald's, or build a large private company.

25.     During the June, 2006 telephone conversation, Schwarz asked JS if, in the event he invested in SMI, he could sell his shares.  JS told Schwarz that, if he invested, he would enjoy redemption rights.  JS explained that Schwarz could, after three years, elect to redeem his shares for their purchase price plus 5% interest.  JS further explained that such payments would be made in three annual installments with the last payment to be made on the six year anniversary of the Series B Preferred Stock closing date.  At no time did JS tell Schwarz that SMI would not honor his redemption demand if SMI was not earning a certain amount of income or generating a certain amount of profit.  Schwarz relied on what JS told him in deciding whether to invest.  Had JS not omitted from his statement to Schwarz the material fact that his redemption rights were contingent on SMI's performance, Plaintiffs would not have invested in SMI.

26.     On June 20, 2006, Michael Schmitz ("Schmitz") and David Sloan ("Sloan"), then employees of Tennyson West ("Tennyson") and now employees of Bancroft Partners ("Bancroft"), SMI's, JS', and DS' former and current financial advisors, respectively, e-mailed Schwarz the following documents:

  a)      Series B Purchase Agreement

  b)      Investors' Rights Agreement

  c)      Right of First Refusal Agreement

  d)      Co-Sale Agreement

  e)      A&R Articles of Incorporation

  f)      Financing signature pages

  g)      Investor suitability questionnaire

h)      Final Term Sheet as of May 9, 2006

i)      Risk Disclosure Document as of May 10, 2006

j)      Aquillian Placement Agent Disclosure Statement

k)      Sellers Markets Executive Summary

l)      Sellers Markets Business Overview as of June, 2006

27.      The "Business Overview" sent to Schwarz contained, among other things:

a)      A graph titled, "Sellers Markets Budgeted vs. Actual Plan Monthly Revenue Growth";

b)      A graph titled, "Sellers Markets Monthly Margins (May 2005 - April 2006)";

c)      A graph titled, "Sellers Markets Projected Yearly Revenue Growth (2005-2010)";

d)      A graph titled, "Sellers Markets Projected Monthly Revenue Growth (Apr 2005- Feb 2008)";

Each of the graphs indicated that it was prepared by Tennyson West, Inc.

28.      Nowhere did the graphs indicate that the accounting information they contained was not prepared according to Generally Accepted Accounting Principles ("GAAP") or that the information overstated the value of SMI's assets.

29.      Plaintiffs relied upon the accuracy of the financial information in the graphs in determining whether to sign the closing documents Schmitz and Sloan emailed to them.

30.      Had Plaintiffs known that the information contained in the graphs was not prepared according to GAAP or that the information overstated the value of SMI's assets, they would not have invested in SMI.

31.      The Business Overview sent to Schwarz contained the following language:

"Series B Convertible Preferred shareholder will receive:

-      Liquidation Preference to Common shareholders

-      Non-Cumulative Dividends

-       ***Redemption Rights*** (emphasis added)

-       Exit Option

-       Food Credit".

32.     Nowhere did the Business Overview indicate that the promised redemption rights would not be honored if SMI was not earning a certain amount of income or generating a certain amount of profit.

33.     The Business Overview and the graphs contained no meaningful, cautionary language identifying any of the information contained therein as "forward-looking".

34.     Plaintiffs relied on the language in the Business Overview in deciding whether to invest in SMI.

35.     Had Plaintiffs known that the company would refuse to honor Plaintiffs' promised redemption rights if SMI was not earning a certain amount of income or generating a certain amount of profit, they would not have invested.

36.     Upon information and belief, the financial information contained in the graphs was not prepared according to GAAP.

37.     Upon information and belief, the financial information contained in the graphs overstated the value of SMI's assets.

38.     On June 20, 2006, JS sent Schwarz an email message reading,

        "The following exit strategy's (sic.) are traditional exit's (sic.) for our investors:

-       Having a major company like McDonalds become a minority/majority owner in the company(Chipotle)

-       If the markets look good go for an IPO (Panera Bread)

-       Grow regionally and Harvest (sic.) the profits for our investors(In-N-Out Burger)

We are looking at having an exit for our investors in the next 3-5 years with a projected ***ROI of 30% if we hit our conservative projections***… Jim" (emphasis added).

39.     JS' email did not contain meaningful, cautionary language identifying the information contained therein as "forward-looking"

40.     Upon information and belief, the ROI of 30% JS quoted was based on financial information that overstated the value of the Company's assets.

41.     Upon information and belief, the ROI of 30% JS quoted was based on financial information that was not prepared according to GAAP.

42.     Plaintiffs relied on the accuracy of JS' quoted ROI of 30% in deciding whether to invest.

43.     On June 20, 2006 Schwarz telephoned DS with questions about the documents emailed to him by Schmitz.  DS told Schwarz that if he wanted to invest he had to sign and send the documents in time for SMI to receive them on June 23, 2006.

44.     On June 22, 2006, Schwarz signed the documents as demanded by DS and faxed and sent, via FedEx, the documents to Schmitz and to Peter Bergman of Hayden Bergman, PC, attorneys for SMI, JS, and DS, as instructed.  In so doing, Plaintiffs purchased 21,622 shares of Series B Preferred Stock in SMI.  Plaintiffs' shares constitute securities, as that term is defined by §3(a)(10) of the Securities Exchange Act of 1934 (hereafter, "the 1934 Act"), 15 U.S.C. §79, *et seq.*

45.     After investing in SMI, Plaintiffs received a closing binder containing documents that differed in material ways, with respect to Plaintiffs' redemption rights, from the documents Plaintiffs signed on June 20, 2006.  For example, the version of the Amended and Restated Articles of Incorporation that appears in the binder was signed by James Sellers on June 27, 2006. Section 7(c) of that document contemplates the Company's depositing funds for redemption in a trust fund with "any bank or trust company located in the state (sic.) of California…"  No

language concerning such a trust fund appeared in the version of the document that Plaintiffs signed the previous week on July 22, 2006.

46.     Furthermore, Plaintiffs learned for the first time, after they invested, of other material information including additional debt financing and the addition of another large investor, Bill Russell-Shapiro, to SMI's Advisory Board.

47.     For the next three years SMI, JS, DS, Schmitz, Sloan, Tennyson, and Bancroft painted a rosy picture of SMI's financial condition, all the while soliciting Plaintiffs for additional money for more Series B shares, other ventures, and, eventually, Series C shares.

48.     The overly optimistic and unreasonably high projections SMI, JS, DS, Schmitz, Sloan, Tennyson, and Bancroft sent to Plaintiffs were material misrepresentations of SMI's value because they were premised upon accounting information that was not prepared according to GAAP and that overstated the value of SMI's assets.

49.     SMI, JS, DS, Schmitz, Sloan, Tennyson, and Bancroft continued sending Plaintiffs "pie in the sky" projections even as SMI was sliding into deterioration.

50.     The above projections had no reasonable relationship to industry standards or historical experience and were not accompanied by meaningful, cautionary language identifying them as "forward-looking."

51.     When Plaintiffs informed DS that they were considering exercising their redemption rights, DS sent Schwarz an email on July 10, 2009, saying, "The redemption rate is at its purchase price of $1.85 + a 5% interest.  ***The company will provide payouts… sometime next year…***" (emphasis added.)

52.     DS did not tell Plaintiffs that their shares would only be redeemed if SMI earned a certain amount of income or generated a certain amount of profit.

53.     Pursuant to contract, on July 17, 2009 Plaintiffs exercised their redemption rights with respect to all of their shares, believing that one year later SMI would honor its end of the bargain and redeem one third of Plaintiffs' shares for the price of $1.85 per share plus 5% interest per annum.  On that date, Plaintiffs sent two notarized redemption demand letters to Bergman, as instructed.

54.     Four days after Plaintiffs exercised their redemption rights, JS sent Schwarz an email warning of dire consequences to the value of Plaintiffs' investment if they did not participate in a Series C round and invest more money in SMI.  JS warned that SMI could be sold or that its debt could be restructured "in a manner presided over by the courts, either of which would likely result in an adverse impact on the interests of the Company's shareholders and other stakeholders."  JS said, "Thus, shareholders that are not in a position to participate in the next financing should expect to be substantially diluted."

55.     In or about March, 2010, Plaintiffs' corporate counsel communicated on numerous occasions with JS and DS, as directed by Bergman who no longer represented them.  Plaintiffs' counsel requested specific info on SMI 's profits, losses, expenses, and other material financial and business information.

56.     In this regard, Plaintiffs' counsel sent numerous and repeated emails during the spring of 2010 requesting answers to detailed questions concerning SMI and its financial info.

57.     SMI, JS, and DS failed to adequately respond and refused to provide much of the information requested.

58.     On March 5, 2010, DS sent Schwarz an email revealing, for the first time, that SMI's accounting entries, prepared by RSI, were not categorized appropriately and were not accurate.

59.     Pursuant to Section 7(b) of the "Amended and Restated Articles of Incorporation of Sellers Markets, Inc.":

"At least fifteen (15), but no more than thirty (30), days prior to each Redemption Date, written notice shall be mailed, first class postage prepaid, to each holder of record… of the Series B Preferred Stock to be redeemed… notifying such holder of the redemption to be effected, specifying the number of shares to be redeemed from such holder, the Redemption Date, the Redemption Price, the place at which payment may be obtained and calling upon such holder to surrender to the Corporation, in the manner and at the place designated, the holder's certificate or certificates representing the shares to be redeemed (the **"Redemption Notice"**).  (emphasis in original).

60.     Sellers did not send Plaintiffs a Redemption Notice that comported with Section 7(b). Instead, on June 12, 2010 Sellers sent Schwarz an email addressed to "Holders of Series B Preferred Stock".  In his letter, JS said that SMI was reneging on its promise to redeem Plaintiffs' shares because SMI was not earning a certain amount of income or generating a certain amount of profit.

61.     This was the first time any of the Defendants or their attorneys claimed that they did not have to honor Plaintiffs' redemption rights if the Company was not earning a certain amount of income or generating a certain amount of profits.

62.     On October 4, 2010, Michael Sullivan, corporate counsel to SMI, JS, and DS, confirmed what DS revealed seven months earlier – SMI's books and records did not reflect proper and accurate accounting; its books were not scrutinized for compliance with GAAP, and its balance sheet overstated the value of its assets.  Specifically, Sullivan said,

"The 3/21 balance sheet of the Company that you refer to contained a number of entries that needed to be revised to better *reflect proper and accurate accounting.*  The Company's books and records had been kept in a way that worked fine for internal purposes, but *they had never been scrutinized for compliance with generally accepted accounting principles.*  The Company made a good faith effort to make proper adjustments to assets and liabilities to reflect fair values, which were reflected in 6/13/10 balance sheet.  If anything, the balance sheet may still *overstate the value of assets.*  (emphasis added).

63.     Pursuant to Section 2.1(a)(ii) of the "Sellers Markets, Inc. Amended and Restated Investors' Rights Agreement":

"Upon request, the Company will furnish to each Holder, within forty-five (45) days after the end of each quarterly accounting period in each fiscal year of the company, an unaudited balance sheet of the Company, as of the end of each such quarterly period, and unaudited statements of income and cash flows of the Company, for such period."

64.     Plaintiffs timely requested that SMI provide the above required information for the first quarter of 2010.  Pursuant to contract, that statement was to be provided on or before May 15, 2010.  SMI did not provide it until 13 days after the due date on May 28, 2010

65.     Plaintiffs timely requested that SMI provide the above required information for the third quarter of 2010.  Pursuant to contract, that statement was to be provided on or before November 14, 2010.  SMI did not provide it until 33 days after the due date on December 17, 2010.

66.     SMI had never, prior to March 5, 2010, disclosed to Plaintiffs;

- that its balance sheets did not reflect proper and accurate accounting;

- that the company's books and records had never been scrutinized for compliance with generally accepted accounting principles; or

- that the company's balance sheets overstated the value of assets.

67.     Had Plaintiffs known any of the above inaccuracies and deficiencies with regard to the SMI's books, records, and financial statements, they would not have invested in SMI.

68.     The assets-to-liabilities ratios for the following time periods, as reported by SMI in its financial statements, were as follows:

- "Balance Sheet, Sellers Market Consolidated as of 12/30/2007".  This statement showed          *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 04/20/2008."  This statement showed          *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 12/28/2008."  This statement showed          *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 06/14/2009."  This statement showed          *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 12/27/2009."  This statement showed          *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 12/27/2009." This statement showed                      *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 12/27/2009." This statement, showed                      *REDACTED*[1]

- "Balance Sheet, Sellers Market Consolidated as of 03/21/2010." This statement showed                      *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 03/21/2010." This statement showed                      *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 06/13/2010." This statement showed                      *REDACTED*

- "Balance Sheet, Sellers Market Consolidated as of 09/05/2010." This statement showed                      *REDACTED*

Below is a graph showing

*REDACTED*

69.     Upon information and belief, SMI, JS, DS, and RSI manipulated SMI's assets-to-liabilities ratio to keep it below 1.25% beginning in June, 2010, when SMI became contractually obligated to redeem Plaintiffs' shares.

70.     Upon information and belief, this manipulation was done as part of a scheme to evade SMI's redemption obligations to Plaintiffs.

**COUNT I**
**Violation of SEC Rule 10b-5**

---

[1]                      *REDACTED*

**15 U.S.C.A. § 10(b)**
**Against all Defendants**

71.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 70 inclusive,

of this Complaint as though fully set forth herein.

72.    Under Rule 10b-5 of the 1934 Securities and Exchange Act Rules,

"it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

73.    Defendants, as detailed below, used interstate e-mail, telephone, and facsimile

communications to employ a device, scheme, or artifice to defraud Plaintiffs in connection with

the purchase of SMI securities.

74.    Defendants, as detailed below, used interstate e-mail, telephone, and facsimile

communications to make untrue statements of material fact and to omit to state material facts

necessary in order to make statements made not misleading in connection with the purchase of

SMI securities.

### *Defendants' misrepresentation that Plaintiffs could expect a 30% return on their investment.*

75.    JS used interstate e-mail to employ a device, scheme, or artifice to defraud Plaintiffs by

telling Schwarz, before he decided to purchase SMI securities, that he could expect a 30% return

on his investment.

76.    JS used interstate e-mail to make the misrepresentation that Plaintiffs could expect a 30%

return on their investment.

77.    JS intended to defraud Plaintiffs when he told Schwarz that, if he invested, he could

expect a 30% return on his investment.

78.     JS made a material misrepresentation when he told Schwarz that, as a Series B investor, he could expect a 30% return on his investment.

79.     JS' statement was misleading because it enticed Plaintiffs into purchasing SMI's securities with the false belief that they would see a 30% return on their investment.

80.     The above misrepresentation made by JS was made in connection with Plaintiffs' purchase of securities.

81.     As the CEO and President of the Company, JS was in a position that directly oversaw the Company's practices and operations.

82.     JS knew his above misrepresentation was false or had access to information that would have shown its falsity when made.

83.     JS knew his above misrepresentation was false because he knew that SMI's accounting records financial statements overstated the value of SMI's assets.

84.     JS knew his above misrepresentation was false because he knew that SMI's financial statements were not prepared in accordance with GAAP.

85.     Plaintiffs relied on JS' misrepresentation of fact in that they invested $40,000.00 in SMI believing that they would see a 30% return on their investment.

86.     Plaintiffs' reliance on JS' misrepresentation of fact was the proximate cause of the injury for which Plaintiffs seek to recover damages because Plaintiffs would not have invested in SMI had they not believed they would see a 30% return on their investment.

87.     JS' email telling Plaintiffs they could expect to see a 30% return on their investment was not accompanied by meaningful, cautionary language identifying the statement as "forward-looking".

88.     The above misrepresentation made by JS resulted in concrete personal benefit to him, DS, and SMI.  Specifically, the misrepresentation resulted in Plaintiffs' investing in SMI $40,000.00 that they would not have invested absent JS' misrepresentation or omission of fact.

89.     As the Company's Corporate Secretary, DS knew or should have known of the falsity of JS' misrepresentation.

90.     As the Company's financial advisor, Tennyson had central and substantial involvement in JS' misrepresentation as it, upon information and belief, advised JS on the return on investment Series B investors could expect.

91.     Tennyson knew that its financial advice would be communicated to Plaintiffs because Schmitz and Sloan, its employees, were co-signatories of the email message Schmitz sent to Schwarz on June 20, 2006, attaching a Business Overview, prepared by Tennyson, containing financial information upon which Plaintiffs relied as they were deciding whether to invest.

92.     The Business Overview contained no meaningful, cautionary language identifying its content as 'forward-looking."

93.     The Business Overview contained financial information that overstated the value of SMI's assets and that was not prepared in accordance with GAAP.

94.     As the Company's financial advisor, Schmitz had central and substantial involvement in JS' misrepresentation as he, upon information and belief, advised JS on the return on investment Series B investors could expect.

95.     Schmitz knew that his financial advice would be communicated to Plaintiffs because he was co-signatory, along with Sloan, of the email message he sent to Schwarz on June 20, 2006, attaching a Business Overview, prepared by Tennyson, containing financial information upon which Plaintiffs relied as they were deciding whether to invest.  The Business Overview contained no meaningful, cautionary language identifying its content as "forward-looking."

96.     As the Company's financial advisor, Sloan had central and substantial involvement in JS' misrepresentation as he, upon information and belief, advised JS on the return on investment Series B investors could expect.

97.     Sloan knew that his financial advice would be communicated to Plaintiffs because he was co-signatory, along with Schmitz, of the email message Schmitz sent to Schwarz on June 20, 2006, attaching a Business Overview, prepared by Tennyson, containing financial information upon which Plaintiffs relied as they were deciding whether to invest.  The Business Overview contained no meaningful, cautionary language identifying its content as "forward-looking."

98.     As the Company's accountant, RSI had central and substantial involvement in the preparation and reporting of the Company's financial statements upon which JS relied in making his misrepresentation to Plaintiffs.

### *Defendants' misrepresentation that Plaintiffs' redemption rights were not contingent upon SMI's performance.*

99.     JS used interstate telephone communications to employ a device, scheme, or artifice to defraud Plaintiffs by telling Schwarz, before he decided to purchase SMI securities, that he would be able to redeem his shares after three years without regard to SMI's performance.

100.    JS used interstate telephone communication to omit from his statement to Schwarz that he, as a Series B investor, could redeem his shares after three years, the material fact that Plaintiffs' redemption rights would not be honored if SMI was not earning a certain amount of income or generating a certain amount of profit.

101.    JS intended to defraud Plaintiffs when he told Schwarz that, as a Series B investor, he would enjoy redemption rights but did not tell him that those rights were contingent upon SMI's performance.

102.     JS made a material misrepresentation or omission of fact when he told Schwarz that, as a Series B investor, he would enjoy redemption rights but did not tell him that those rights were contingent upon SMI's performance.

103.     JS' above statement was misleading because it enticed Plaintiffs into purchasing SMI's securities with the false belief that they could redeem their shares after three years without regard to SMI's performance.

104.     The above misrepresentation or omission of fact made by JS was made in connection with Plaintiffs' purchase of securities.

105.     As the CEO and President of SMI, JS was in a position that directly oversaw SMI's practices and operations.

106.     JS knew his above misrepresentation was false or had access to information that would have shown its falsity when made.

107.     JS knew his above misrepresentation was false because he knew that SMI would not redeem Plaintiffs' shares unless SMI was earning a certain amount of income or generating a certain amount of profit.

108.     Plaintiffs relied on JS' misrepresentation of fact in that they invested $40,000.00 in SMI believing that they could redeem their shares after three years and that their redemption demand would be honored without regard to SMI's performance.

109.     Plaintiffs' reliance on JS' misrepresentation of fact was the proximate cause of the injury for which Plaintiffs seek to recover damages because Plaintiffs would not have invested in SMI had they not believed their redemption rights would be honored without regard to SMI's performance.

110.   The above misrepresentation made by JS resulted in concrete personal benefit to him, SMI, and DS.  Specifically, the misrepresentation resulted in Plaintiffs' investing in SMI $40,000.00 that they would not have invested absent JS' misrepresentation or omission of fact.

111.   As SMI's Corporate Secretary, DS knew or should have known of the falsity of JS' misrepresentation.

112.   As SMI's financial advisor, Tennyson had central and substantial involvement in JS' misrepresentation as it, upon information and belief, advised JS on the redemption rights Series B investors could expect.

113.   Tennyson knew that its financial advice would be communicated to Plaintiffs because Schmitz and Sloan, its employees, were co-signatories of the email message Schmitz sent to Schwarz on June 20, 2006, attaching a Business Overview, prepared by Tennyson, promising redemption rights to Series B investors.

114.   As SMI's financial advisor, Schmitz had central and substantial involvement in JS' misrepresentation as he, upon information and belief, advised JS on the redemption rights Series B investors could expect.

115.   Schmitz knew that his financial advice would be communicated to Plaintiffs because he was co-signatory, along with Sloan, of the email message he sent to Schwarz on June 20, 2006, attaching a Business Overview, prepared by Tennyson, promising redemption rights to Series B investors.

116.   As SMI's financial advisor, Sloan had central and substantial involvement in JS' misrepresentation as he, upon information and belief, advised JS on the redemption rights Series B investors could expect.

117.   Sloan knew that his financial advice would be communicated to Plaintiffs because he was co-signatory, along with Schmitz, of the email message Schmitz sent to Schwarz on June 20,

2006, attaching a Business Overview, prepared by Tennyson, promising redemption rights to

Series B investors.

### Defendants' omission of the fact that SMI's financial information overstated the value of SMI's assets and was not prepared in accordance with GAAP.

118.    Defendants each used interstate e-mail and telephone communications to employ a device, scheme, or artifice to defraud Plaintiffs by omitting the material fact from their representations, before Plaitniffs decided to purchase SMI securities, that SMI's financial information overstated the value of SMI's assets and was not prepared in accordance with GAAP.

119.    Defendants intended to defraud Plaintiffs when they sent Plaintiffs a Business Overview containing financial information promising high returns but omitting the material fact that the financial information overstated the value of SMI's assets and was not prepared in accordance with GAAP.

120.    Defendants' omission was misleading because it enticed Plaintiffs into purchasing SMI's securities with the false belief that they would see a high return on their investment.

121.    As the CEO and President of SMI, JS was in a position that directly oversaw SMI's practices and operations.

122.    JS knew the above misrepresentation was false or had access to information that would have shown its falsity when made.

123.    JS knew the above misrepresentation was false because he knew that SMI's financial information overstated the value of its assets and that it was not prepared in accordance with GAAP.

124.    Plaintiffs relied on Defendants' misrepresentation of fact in that they invested $40,000.00 in SMI believing that they would see a high return on their investment.

125.    Plaintiffs' reliance on Defendants' misrepresentation of fact was the proximate cause of the injury for which Plaintiffs seek to recover damages because Plaintiffs would not have invested

in SMI had they not believed that they would see the high return on their investment promised in the Business Overview.

126.    The above misrepresentation concrete personal benefit to SMI, JS, and DS.  Specifically, the misrepresentation resulted in Plaintiffs' investing in SMI $40,000.00 that they would not have invested absent Defendants' misrepresentation or omission of fact.

127.    As SMI's Corporate Secretary, DS knew or should have known of the falsity of the above misrepresentation.

128.    As SMI's financial advisor, Tennyson had central and substantial involvement in the misrepresentation as it, upon information and belief, prepared the Business Overview promising investors a high return.

129.    Tennyson knew that its financial advice would be communicated to Plaintiffs because Schmitz and Sloan, its employees, were co-signatories of the email message Schmitz sent to Schwarz on June 20, 2006, attaching the Business Overview, prepared by Tennyson, promising a high rate of return.

130.    As SMI's financial advisor, Schmitz had central and substantial involvement in the misrepresentation as he, upon information and belief, co-authored the Business Overview.

131.    Schmitz knew that his financial advice would be communicated to Plaintiffs because he was co-signatory, along with Sloan, of the email message he sent to Schwarz on June 20, 2006, attaching the Business Overview, prepared by Tennyson, promising a high return to Series B investors.

132.    As SMI's financial advisor, Sloan had central and substantial involvement in the misrepresentation as he, upon information and belief, co-authored the Business Overview promising a high return.

133.    Sloan knew that his financial advice would be communicated to Plaintiffs because he was

co-signatory, along with Schmitz, of the email message Schmitz sent to Schwarz on June 20,

2006, attaching the Business Overview, prepared by Tennyson, promising a high return to Series

B investors.

134.    Nowhere in the Business Overview was there meaningful, cautionary language identifying

the promises contained therein as "forward-looking."

135.    As the Company's accountant, RSI had central and substantial involvement in the

misrepresentation because it prepared and reported the SMI financial statements that overstated

the value of SMI's assets and that were not prepared in accordance with GAAP.


**COUNT II**
**Violation of SEC Rule 10b-3**
**15 U.S.C.A. § 15**
**Against Aquillian**

136.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 135,

inclusive, of this Complaint as though fully set forth herein.

137.    SEC Rule 10b3 indicates that

"It shall be unlawful for any broker or dealer, directly or indirectly, by the use of any means or
instrumentality of interstate commerce, or of the mails… to use or employ, in connection with the
purchase or sale of any security… any act, practice, or course of business defined by the
Commission to be included within the term 'manipulative, deceptive, or other fraudulent device
or contrivance…'".

138.    At all relevant times, Aquillian was the broker-dealer of SMI's securities.

139.    Aquillian used interstate e-mail, telephone, and facsimile communications to employ a

manipulative, deceptive, or fraudulent device or contrivance to defraud Plaintiffs.

140.    Aquillian, by virtue of its position as SMI's broker-dealer, knew or should have known

that the other Defendants misrepresented to Plaintiffs that they could expect a 30% return on their

investment as alleged in ¶¶ 75-98, above.

141.    Aquillian, by virtue of its position as SMI's broker-dealer, knew or should have known that the other Defendants misrepresented to Plaintiffs that Plaintiffs' redemption rights were not contingent upon SMI's performance as alleged in ¶¶ 99-117, above.

142.    Aquillian, by virtue of its position as SMI's broker-dealer, knew or should have known that the other Defendants misrepresented to Plaintiffs that SMI's financial information overstated the value of SMI's assets and was not prepared in accordance with GAAP as alleged in ¶¶ 118-135 above.

**COUNT III**
**Breach of Contract**
**Against SMI, JS, and DS**

143.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 142, inclusive, of this Complaint as though fully set forth herein.

144.    On June 20, 2006, SMI, JS, and DS offered Schwarz an investment opportunity in SMI, a restaurant business.

145.    On June 22, 2006, Plaintiffs accepted SMI's, JS', and DS' offer by signing and returning a contract titled "Sellers Markets, Inc. Amended and Restated Investors' Rights Agreement."

146.    On June 22, 2006, Plaintiffs paid good and valuable consideration in the amount of $40,000 to SMI, JS, and DS as the purchase price of 21,622 shares of Series B SMI preferred stock.

147.    Pursuant to the terms of the contract, upon receipt of Plaintiffs' redemption demand, SMI, JS, and DS were required to redeem, in three annual installment payments, Plaintiffs' shares for the purchase price of $40,000.00 plus interest in the amount of 5% per annum.

148.    On July 17, 2009, Plaintiffs, pursuant to the terms of the contract, tendered to SMI, JS, and DS a redemption demand for all of the 21,622 shares of company stock they purchased.

149.   Pursuant to the terms of the contract, SMI's, JS', and DS' first payment of $13,333.33 in principal plus $8,000 in interest was due to Plaintiffs on June 27, 2010.

150.   Despite demand, SMI, JS, and DS have failed to pay the amount due and owing under the contract.

151.   SMI, JS, and DS have breached the contract due to their failure to pay all amounts due and owing.

152.   As a direct and proximate cause and result of the wrongful acts and omissions of SMI, JS, and DS as alleged above, Plaintiffs have suffered losses in the amount of at least $21,333.33 due and owing to him by SMI, JS, and DS.

**COUNT IV**
**Fraudulent Inducement**
**Against all Defendants**

153.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 152, inclusive, of this Complaint as though fully set forth herein.

154.   When Plaintiffs were considering investing in SMI, Defendants never told Plaintiffs that SMI's financial statements overstated the value of SMI's assets and were not prepared according to GAAP.

155.   Plaintiffs would not have invested in SMI had they known that its financial statements overstated the value of SMI's assets and were not prepared in accordance with GAAP.

156.   Defendants made a material misrepresentation of fact by failing to tell Plaintiffs that SMI's statements overstated the value of SMI's assets and were not prepared in accordance with GAAP.

157.   Defendants knew that SMI's financial statements overstated the value of SMI's assets and were not prepared in accordance with GAAP.

158.    Defendants knew that Plaintiffs would not have invested had they known that SMI's financial statements overstated the value of SMI's assets and were not prepared in accordance with GAAP.

159.    Defendants intentionally induced Plaintiffs to invest $40,000.00 in SMI by omitting to tell Plaintiffs that SMI's financial statements overstated the value of SMI's assets and were not prepared in accordance with GAAP.

160.    When Plaintiffs were considering investing in SMI, Defendants never told Plaintiffs that SMI's financial statements overstated the value of SMI's assets and were not prepared according to GAAP.

161.    Plaintiffs would not have invested in SMI had they known that its financial statements overstated the value of SMI's assets and were not prepared in accordance with GAAP.

162.    Defendants made a material misrepresentation of fact by telling Plaintiffs, while they were deciding whether to invest, that they could expect a 30% return on their investment.

163.    Defendants knew that Plaintiffs could not expect to see a 30% return on their investment.

164.    Defendants knew that Plaintiffs would not have invested had they not been told that they could expect to see a 30% return on their investment.

165.    Defendants intentionally induced Plaintiffs to invest $40,000.00 in SMI by misrepresenting to Plaintiffs that they could expect to see a 30% return on their investment.

166.    When Plaintiffs were considering investing in SMI, Defendants misrepresented to Plaintiffs that they could redeem their shares without regard to SMI's performance.

167.    Plaintiffs would not have invested in SMI had they known that they could only redeem their shares if SMI earned a certain amount of income or generated a certain amount of profit.

168.     Defendants made a material misrepresentation of fact by failing to tell Plaintiffs that they could only redeem their shares if SMI earned a certain amount of income or generated a certain amount of profit.

169.     Defendants knew that it was their position that Plaintiffs could only redeem their shares if SMI earned a certain amount of income or generated a certain amount of profit.

170.     Defendants knew that Plaintiffs would not have invested had they known that SMI, JS, and DS, would not honor their redemption demand unless SMI was earning a certain amount of income or generating a certain amount of profit.

171.     Defendants intentionally induced Plaintiffs to invest $40,000.00 in SMI by omitting to tell Plaintiffs that their redemption rights would only be honored if SMI was earning a certain amount of income or generating a certain amount of profit.

**COUNT V**
**Breach of Fiduciary Duties**
**Against JS and DS**

172.     Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 171, inclusive, of this Complaint as though fully set forth herein.

173.     JS and DS owed Plaintiffs a fiduciary duty by virtue of their obligation to protect Plaintiffs' investment.

174.     JS and DS breached their fiduciary duties to Plaintiffs by failing to honor Plaintiffs' promised redemption rights.

175.     JS and DS breached their fiduciary duties to Plaintiffs by failing to provide them with requested financial statements in a timely manner.

176.     JS and DS breached their fiduciary duties to Plaintiffs by failing to provide them with financial statements prepared in accordance with GAAP.

177.    JS and DS breached their fiduciary duties to Plaintiffs by failing to provide them with financial statements that accurately valued SMI's assets.

178.    JS and DS breached their fiduciary duties to Plaintiffs by failing to provide them with adequate answers to their questions about SMI's financial statements.

179.    JS and DS breached their fiduciary duties to Plaintiffs by failing to disclose to them the lawsuit of *L.A. Specialty Produce Co., Inc. v. Sellers Markets, Inc., et al.,* N.D. Cal. 2010, Case No. cv-10-2056 during its pendency, the outcome of which could have had a materially negative impact on Plaintiffs' investment.

180.    JS and DS breached their fiduciary duties to Plaintiffs by failing to tell them that their promised redemption rights were contingent upon SMI's performance.

181.    JS and DS breached their fiduciary duties to Plaintiffs by promising them a 30% return on their investment knowing such a return was unlikely or impossible.

182.    JS and DS breached their fiduciary duties to Plaintiffs by misrepresenting to them that SMI would redeem their shares and pay them from "cash flow" when it did not intend to do so.

**COUNT VI**
**Violation of Illinois Securities Act Section 12**
**Against all Defendants**

183.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 182, inclusive, of this Complaint as though fully set forth herein.

184.    Pursuant to Section 12 of the Illinois Securities Act:

"It shall be a violation of the provisions of this Act for any person… to engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof."

185.    Defendants, as alleged more fully in ¶¶ 75-98 above, engaged in the sale of securities to the Plaintiffs in way that worked a fraud or deceit upon Plaintiffs by misrepresenting to Plaintiffs that they could expect a 30% return on their investment.

186.     Defendants, as alleged more fully in ¶¶ 99-117 above, engaged in the sale of securities to the Plaintiffs in a way that worked a fraud or deceit upon Plaintiffs by omitting from their representations to Plaintiffs the material fact that Plaintiffs' redemption rights were contingent upon SMI's performance.

187.     Defendants, as alleged more fully in ¶¶ 118-135 above, engaged in the sale of securities to the Plaintiffs in a way that worked a fraud or deceit upon Plaintiffs by omitting from their misrepresentations to Plaintiffs the material fact that SMI's financial information overstated the value of SMI's assets and was not prepared in accordance with GAAP.

## COUNT VII
### Violation of California Corporation Code Section 25401
### Against all Defendants

188.     Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 187, inclusive, of this Complaint as though fully set forth herein.

189.     Pursuant to Section 25401 of the California Corporations Code,

 "It is unlawful for any person to offer or sell a security in (California) or buy or offer to buy a security in (California) by any means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

190.     Defendants, as alleged more fully in ¶¶ 75-98 above, sold securities by means of communications including the untrue statement that Plaintiffs could expect a 30% return on their investment.

191.     Defendants, as alleged more fully in ¶¶ 99-117 above, sold securities by means of communications including the omission that Plaintiffs' redemption rights were contingent upon SMI's performance.

192.    Defendants, as alleged more fully in ¶¶ 118-135 above, sold securities by means of communications including the omission that SMI's financial information overstated the value of SMI's assets and was not prepared in accordance with GAAP.


## COUNT VIII
## For Declaratory Relief – As Against All Defendants

193.    Plaintiffs refer to, and incorporate by reference, the allegations of paragraphs 1 through 192, as though fully set forth herein.

194.    An actual controversy has arisen and now exists relating to the rights and duties of the parties herein in that Plaintiffs contend that the contract requires SMI, JS, and DS to immediately redeem one third of Plaintiffs' shares for the price of $13,333.33 plus 5% interest per annum for a total of $21,333.33.

195.    An actual controversy has arisen and now exists relating to the rights and duties of the parties herein in that Plaintiffs contend that, due to Defendants' fraud, Plaintiffs may rescind the contract and tender all their shares to the SMI, JS, and DS who must refund Plaintiffs' full consideration of $40,000 plus 10% interest per annum for a total of $58,000.00.

196.    Additionally, Plaintiffs seek an Order of this Court declaring that their claims are superior to and have priority as against any and all claims which Defendants might assert to the accounts receivable, inventory and proceeds of Defendants, to the extent such receivables, inventory and proceeds constitute funds owed to Plaintiffs.


## STATUTORY SAFE HARBOR

197.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false forward-looking statements pleaded in this Complaint.  The safe harbor does not apply to SMI's allegedly false financial statements or

promises of high returns.  None of the written forward-looking statements made were identified as forward-looking statements, nor was it stated that actual results "could differ materially from those projected."  Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements accompany those forward-looking statements.  Each of the forward-looking statements alleged herein to be false was authorized by an executive officer of SMI and was actually known by each of the Individual Defendants to be false when made.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Awarding Plaintiffs damages, interest and costs;

B.      Awarding such other relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiffs demand a trial by jury.

Respectfully submitted,

STEVEN E. SCHWARZ, ESQ.

By:    /s/ Steven E. Schwarz
Plaintiff *in Pro Se*


REENA LEVIN

By:    /s/ Reena Levin
Plaintiff *in Pro Se*


Dated:  January 24, 2011

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steven E. Schwarz
Reena Levin
2461 W. Foster Ave., #1W
Chicago, IL 60625
(773) 837-6134